IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Case No. 1:17-CR-224 |
| | ) | |
| v. | ) | The Honorable Theresa C. Buchanan |
| | ) | |
| YOUNG YI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION</u>**

The United States of America, by and through undersigned counsel, hereby files its response to defendant Young Yi's ("Yi" or the "defendant") Motion for Reconsideration of Detention and to Set Appropriate Conditions of Release. As set forth in more detail below, the Court should deny the motion because the defendant has failed to rebut the overwhelming evidence demonstrating that she poses a substantial flight risk. As the government has argued throughout, the defendant was and remains a flight risk in light of the serious charges against her, the weight of the evidence, her financial status, extensive overseas travel, as well as additional information that the government has learned since her detention hearing that was not previously before the Court.

While the defendant correctly notes in her filing that the parties have discussed a proposed bond package, those discussions are, at best, described as ongoing and incomplete. Given the current state of negotiations, the government does not consent to the defendant's release because defendant has not agreed to a bond package that adequately addresses the risk of flight. In short, there is no agreement between the government and the defendant on a bond package. Among other

things, the defendant has not provided the government with adequate documentation—including title searches and copies of deeds—and instead has made vague promises about its plans to compile a complete bond package. For the government to agree to a bond package, it must include—at a minimum—the following: (1) GPS electronic monitoring; and (2) sufficient documentation regarding the remainder of real property tied to the defendant that would be pledged as collateral towards her bond, and (3) additional pretrial release conditions,[1] which the defendant appears to have agreed to.[2] The defendant's current proposed bond package fails to meet these requirements.[3] For example, it is the government's understanding that the defendant has and will oppose any GPS electronic monitoring requirement and will argue that it is not necessary.

Aside from the defendant's incomplete and insufficient bail package, the government submits the following: First, the government has learned new information since the defendant's detention hearing that reinforces the government's position that the defendant poses a substantial risk of flight. Second, the government briefly responds to some of the defendant's assertions

---

[1] These conditions include: (i) notify current and future employers of indictment, (ii) surrender all passports and travel documents, and agree not to seek any new travel documents; (iii) not depart the Washington D.C. metropolitan area without notification or prior approval of pretrial services, (iv) reside with a third party custodian, (v) no contact with potential witnesses unless in the presence of counsel, or with respect to family, no discussion of the case outside the presence of counsel, (vi) not engage in financial transactions greater than $5,000 without prior notification and approval of pretrial services.

[2] The specific properties tied to the property bond include the following: (a) 8220 Crestwood Heights Drive, Unit 107, McLean, VA, 22102; (b) 20262 Redrose Drive, Sterling, VA, 20165; (c) 7001 Heritage Plaza, Unit 125, Gainesville, VA, 22033; (d) 12105 Greenway Court, Unit 102, Fairfax, VA, 22033; (e) 14631 Lee Highway, Suites 401-404, 409-412, Centreville, VA, 20121; and (f) 13820 Lullaby Road, Germantown, MD, 20874. The government understands that two of these properties (*i.e.,* the Greenway Court and Heritage Village Plaza properties) will be used to satisfy legal fees subject to the condition that there is a valid sale. Further, the defendant would need to agree that she would not seek return of any of those proceeds from counsel or otherwise exercise control of their disposition, absent notification and approval by the Court.

[3] As of this writing, and as instructed by the Court, the defendant has apparently also failed to submit a proposed package containing the required documentation to the court for its consideration.

regarding flight risk from her Motion.[4]  And third, the government addresses several factual inaccuracies in defendant's Motion.

**I. Recent Developments Underscore Defendant's Status as a Flight Risk**

    **A. The Defendant's ICE Detainer**

On October 4, 2017, the Department of Homeland Security, Immigration and Customs Enforcement ("DHS-ICE"), lodged an immigrationdDetainer against the defendant. According to the detainer, "Upon completion of the proceeding or investigation for which the [defendant] was transferred to your custody, DHS intends to resume custody of the [defendant] to complete processing and/or make an admissibility determination." In light of the detainer, even if the defendant is released, it appears that DHS-ICE will seek to detain the defendant for some period of time to make an admissibility determination. The defendant's immigration status provides an additional basis to support finding that she poses a flight risk.

    **B. The Defendant's Structuring Activity**

After the detention hearing, in an attempt to identify appropriate bond conditions, the defendant provided the government with updated bank statements. The government did not have these particular bank statements at the time of the detention hearing. From reviewing these statements, it is apparent that the defendant has conducted numerous structured financial transactions, including some within the last four months. Contrary to the defendant's characterization of her transactions as "standard," *see* Def. Mot. at 3, n. 1, the defendant's recent structured transactions bear the hallmarks of textbook money laundering.

---

[4] The government also incorporates its Motion for Detention, which addresses many of these points, and the evidence presented at the December detention hearing. Dkt. 15.

For example, over the past roughly year and a half, the defendant structured approximately 20 wire transactions through her bank accounts immediately below a threshold of $10,000, at increments between $9,000 and $9,999, in an apparent effort to evade currency transaction reporting requirements.[5] Many of these transactions occurred on the same day, and were wired into and out of the same bank account.

The defendant's recent pattern of structuring financial transactions is strongly indicative of an intent to conceal assets and avoid scrutiny by law enforcement and government regulators. Similarly, this conduct is consistent with the conclusions drawn by the FBI Forensic Accountant (who did not have the specific bank statements at issue at the time of the detention hearing), who testified that the defendant's convoluted and evasive banking activity was indicative of concealment money laundering. These more recent structured financial transactions provide additional evidence of the defendant's efforts to avoid detection and conceal her assets, which is of substantial concern because such transactions could secrete or conceal liquid assets that could facilitate flight. Earlier, after learning she was under criminal investigation and prior to indictment, the defendant had similarly transferred real property out of her name, including into the name of her husband.

**C. The Defendant's Representations to Pretrial Services**

The evidence also suggests that the defendant may have misled pretrial services by underreporting her assets prior to the detention hearing. Prior to the detention hearing, the pretrial services officer interviewed the defendant and asked her a series of detailed questions about any assets in her name, including checking and savings accounts, stocks, bonds, and mutual funds. In

---

[5] Financial institutions, such as banks, are required to report certain financial transactions above $10,000.

response, the defendant told the pretrial services officer that she had approximately $50,000 in assets in a checking account. When asked about any mutual funds, the defendant represented that she did not have any.

Some days after the hearing, however, counsel for the defendant revealed that the defendant, in fact, held $130,000 in mutual funds in her own name. Indeed, based upon the records that the defendant's attorney provided to the government, it appears that the defendant is the sole signatory on that mutual fund account. Given the pattern of deception that she engaged in throughout the sophisticated health care and tax fraud scheme detailed in the indictment, it seems highly unlikely that her failure to disclose $130,000 in assets—again, held in her name—was the result of a mistake or inadvertence.[6]

To date, the defendant has not filed any sworn statement with the Court that identifies and values all assets that she owns or controls. The failure to do so is concerning, since such information is critical so that the Court can itself assess appropriate conditions of release.

### D. The Defendant's Use of the New Covenant Foundation

After the detention hearing, the defendant's attorneys proffered new information about the New Covenant Foundation ("New Covenant")—a purported charitable organization that the defendant and her husband founded. The defendant's attorneys stated that New Covenant signed a promissory note for $500,000 to the defendant's husband. At any point, therefore, the defendant's husband could collect on that promissory note. This fact is significant for several reasons, including that New Covenant is essentially a wholly owned subsidiary of the defendant. Indeed, the evidence shows that it has been and remains a way for the defendant and her husband

---

[6] In addition, by her own estimation and as represented by the defendant's counsel, the defendant and her husband currently own/control approximately $5 million in real estate.

to funnel fraud proceeds to a purported non-profit organization that they actually control. The government would also note that New Covenant has disposed of real property obtained with fraud proceeds and, as a 501(c)(3), has likely not paid taxes on those proceeds.

While the defendant casts New Covenant as a "charitable organization," *see* Def. Mot. at 3, n. 1, New Covenant more closely resembles a shell company used to benefit the defendant and her husband.[7] According to tax records, from at least 2015 through 2016, New Covenant had no physical presence (other than a mailing address for a residential condominium in McLean owned by the defendant), no employees, and not a single volunteer. Similarly, New Covenant, which purports to make grants, has donated a mere 17% of its outgoing expenses.

According to a bank record analysis, approximately 78% of the funds contained in bank accounts associated with New Covenant are traceable to income that 1st Class (*i.e.*, the fraudulent sleep center clinic at the center of the indictment) received from private and public health care benefit programs. The defendant herself was a signatory on the New Covenant bank accounts. And, New Covenant maintains an ongoing financial interest in 1st Class sleep legacy clinics. It is difficult to square these facts with the defendant's description of New Covenant as "an entity designed to further the mission of the Christian Church." Def. Mot. at 7. Taken together, this evidence suggests instead that the defendant used New Covenant to (1) conceal money obtained through her fraudulent scheme; and (2) benefit her and her husband.

### E. The Defendant's Co-Conspirator Pleaded Guilty

---

[7] Notably, under IRS's applicable regulations, qualified 501(c)(3) "charitable organizations" enjoy tax exempt status. To maintain this status, a Section 501(c)(3) organization must not be organized or operated for the benefit of private interests, such as the creator or the creator's family, or persons controlled directly or indirectly by such private interests.

After the detention hearing, Dannie Ahn ("Ahn"), the sole co-defendant, pleaded guilty before Judge Liam O'Grady on December 21, 2017, to Counts 1 and 8 of the Indictment, conspiring with the defendant to commit health care and wire fraud and conspiring with the defendant to defraud the United States. Ahn's guilty plea is compelling evidence to support the scheme charged in the indictment, and substantially increases the weight of the evidence that the government catalogued in its prior submission. *See* 18 U.S.C. § 3142(g)(2).

Among other things, Ahn admitted that he and the defendant, "agreed and understood that claims containing false and fraudulent information would be submitted to health care benefit programs." *See* Statement of Facts as to Dannie Ahn, Dkt. 29, ¶ 4. Ahn further admitted that he and the defendant, "caused kickbacks to be paid to physicians in exchange for referring patients to 1st Class, and disguised the kickbacks using various means." *Id.* Ahn also admitted that he and the defendant, "caused entities that they owned and controlled, including 1st Class Sleep, to pay personal expenses which were falsely and fraudulently characterized as business expenses on the financial books and records for 1st Class." *Id.* ¶ 15. Accordingly, Ahn's guilty plea strengthens the weight of existing evidence against the defendant, further underscoring her status as a flight risk.

## II. The Defendant's Various Arguments

### A. Nature of the Offense/Weight of the Evidence

In addressing the nature and circumstances of the charged offense, and the weight of the evidence, the defendant fails to meaningfully challenge the government's position. The defendant does not contest the statutory maximum penalties for the charged offenses. She does not address (or dispute) the documentary evidence cited in the indictment, including the false tax returns that she filed. She does not dispute her practice of administering medically unnecessary sleep studies in order to boost revenue for 1st Class. Nor does she dispute that she paid kickbacks to physicians

in exchange for referrals. In short, she has failed to refute the government's showing regarding the nature and circumstances of the offense and the weight of the evidence.

Instead, the defendant argues in a conclusory fashion that the allegations against her will likely lead to acquittal and suggests that she was not involved in the business at the time of the fraudulent activity. *See* Def. Mot. at 7, n. 2. The defendant similarly asserts that the "bulk" of insurance claims were legitimate and "were in no way tainted by fraudulent activity." *Id.* These unsupported assertions, however, are undermined when viewed in light of the recent admissions and guilty plea of her co-defendant. Simply put, the nature and seriousness of the offense and the weight of the evidence militate heavily in favor of finding that the defendant poses a substantial flight risk.

**B. History and Characteristics of the Defendant**

The defendant goes to great lengths to argue that she has strong and current ties, including family, in the United States. *See* Def. Mot. at 5-6. The facts, however, undermine these arguments. At the time of her arrest, the defendant had been living in South Korea (where she is a citizen) for nearly a year. The defendant's husband was also living in South Korea. The defendant's mother gave a statement to the government in which she said that her daughter had moved to Korea and that her daughter's siblings were not very close to the defendant. And the defendant had, prior to her most recent trip to South Korea, sold or caused the sale of at least four real properties in the United States in a fairly short span of time. Notably, the defendant sold one of the properties soon after the FBI executed a search warrant at 1st Class. The defendant does not refute, much less explain, the purpose or timing of these transactions. Combined with her travel to South Korea and diminished ties to her family, the property sales suggest that she has been actively liquidating her assets in the United States and may have been preparing to settle abroad permanently.

Furthermore, with regard to her personal history and characteristics, the defendant's assertion that she was engaged in "active cooperation with the investigation" is simply false. *See* Def. Mot. at 6. The government has never interviewed or proffered her. The government received no response to a subpoena for records associated with the defendant's entities. Moreover, the defendant's assertion that she did not buy luxury cars or clothes is belied by the evidence. *Id*. Financial records show that the defendant purchased thousands of dollars in fur coats, a Rolex watch, a Mercedes Benz, and other luxury items. In addition, the defendant purchased a $1.1 million residence in Sterling, Virginia, to which various upgrades were made, including: (1) a commercial bar; (2) a pool; and (3) the largest hot tub that could be placed in a residential home in Virginia. The defendant eventually transferred title of this home for no consideration to her husband. Incidentally, this is the same home where the defendant intends to reside with her third party custodian.

### C. GPS/Electronic Monitoring

The defendant asserts that GPS electronic monitoring is "unnecessary." Def. Mot. at 11. The government disagrees. Such monitoring is warranted in this case because of the following: (1) the defendant's recent suspicious structuring of financial transactions; (2) the defendant's lack of candor with pretrial services about her assets; (3) the defendant's suspicious financial arrangements with respect to her purported "charitable foundation;" (4) the weight of the government's evidence; and (5) the defendant's diminishing personal and financial ties to the United States since becoming aware of the criminal investigation, including in the months prior to indictment. For these reasons, GPS electronic monitoring should be included as a condition of her release.

## III. Conclusion

As the government explained in its prior submission, this case presents a concerning combination of flight risk indicators. Any proposed bail package should accordingly include: (1) GPS electronic monitoring; (2) the conditions to which the defendant has already agreed, *see* Def. Mot. at 10-11 and footnote 1 in this filing; and (3) sufficient documentation regarding the following properties that will serve as collateral toward her bond: (a) 7001 Heritage Village Plaza, Unit 125 Gainesville, Virginia, 22033; (b) 12105 Greenway Court, Unit 102 Fairfax, Virginia, 22033; (c) 13820 Lullaby Road, Germantown, Maryland 20874; (d) 8220 Crestwood Heights Drive, Unit 107, McLean, VA, 22102; (e) 20262 Redrose Drive, Sterling, VA, 20165; and (f) 14631 Lee Highway, Suites 401-404, 409-412, Centreville, VA, 20121.

At present the defendant has not yet substantiated a bail package in a manner sufficient to warrant release pending trial. The government will continue to engage with counsel to work through these issues, but respectfully requests that the Court deny defendant's motion at this juncture.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     /s/
Kevin Lowell
Trial Attorney
Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, Suite 8410
Washington, DC 20005
Phone: (202) 262-7795
E-mail: kevin.lowell@usdoj.gov

By:     /s/
Katherine Wong
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: katherine.l.wong@usdoj.gov

CERTIFICATE OF SERVICE

    I hereby certify that on January 8, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which served a copy on counsel of record.

                                              By:      /s/
                                                     Katherine Wong
                                                     Assistant United States Attorney